IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

JIMMY L. KITTELSON

CV-06-3089-ST

Plaintiff,                                OPINION AND ORDER

v.

MICHAEL J. ASTRUE, Commissioner of Social
Security Administration

Defendant.

STEWART, Magistrate Judge:

## INTRODUCTION

Plaintiff, Jimmy L. Kittelson, brings this action for judicial review of a final decision of

the Commissioner of Social Security denying his application for disability insurance benefits

("DIB") under Title II of the Social Security Act ("Act").  The court has jurisdiction under 42

USC § 405 (g).  All parties have consented to allow a Magistrate Judge to enter final orders and

judgment in this case in accordance with FRCP 73 and 28 USC § 636(c) (docket #13).  For the

reasons set forth below, the Commissioner's decision is reversed and remanded for payment of benefits.

## <u>BACKGROUND</u>

Born in 1942, Kittelson was 54 years old on January 1, 1997, the alleged date of onset of his disability, and 56 years old when last insured, June 30, 1998. Tr. 117-20. He has a high school education and studied journalism for approximately one year at the University of Washington. Tr. 481. He served in the U.S. Marine Corps from 1964 to 1967, was part of the first combat regiment sent to Viet Nam in 1965 where he served for nine months as a warehouseman at a forward supply point, and experienced some level of combat, including being "shot at." Tr. 197, 230, 232-33, 238, 252, 346, 351, 353, 481, 488, 711.

After receiving an honorable discharge, Kittelson worked multiple jobs. Tr. 125-40. During the 15 years preceding the alleged onset date of his disability, Kittelson worked as a child-care provider, deck hand for fishing boats, dishwasher, security guard, and clerk at an adult video store. Tr. 135-40. Kittelson has remained unemployed since some time in 1993 when he worked for an elderly couple as a gardener/handyman. Tr. 197.

In the late 80's and early 90's Kittelson began to experience increasing problems with depression and alcoholism. Tr. 196, 233. These ultimately resulted in multiple hospitalizations and residencies at Veterans Administration facilities for treatment of both alcoholism and depression. *Id.* Most recently, Kittelson resided at the Veterans Administration domiciliary in White City Oregon ("VA Dom") from November of 1994 until at least July of 2002 (the end of the administrative record), except for one 18-month period between May 1996 and October 1997.

## ADMINISTRATIVE HISTORY

Kittelson first applied for and was awarded DIB in February 1993. Tr. 16. However, those benefits were terminated on December 31, 1996, because his patterns of alcohol abuse were deemed material to the previous finding that he was disabled. *Id.* This termination was precipitated by a change in the law that prohibited the payment of benefits to individuals disabled by drug or alcohol abuse. Tr. 16-17.

Kittelson applied again for DIB on April 28, 1998, alleging disability due to depression and anxiety with an onset date of January 1, 1997 (the day after his previous benefits were terminated).[1] Tr. 17, 117-20. The SSA denied that application initially and upon reconsideration. Tr 101-12. Kittelson then requested a hearing before an ALJ. Tr. 113-14.

On January 18, 2002, Kittelson appeared with counsel at a hearing before an ALJ who received testimony by Kittelson and a Vocational Expert ("VE"). Tr. 672-708. The ALJ issued an Unfavorable Decision on February 20, 2002. Tr. 50-60. Kittelson filed a Request for Review of the hearing decision with the Appeals Council. Tr. 61-62. The Appeals Council found the majority of Kittelson's arguments on review "unpersuasive," but nevertheless vacated and remanded the ALJ's decision in order to evaluate a disability rating by the Department of Veterans Affairs ("VA Rating Decision") in light of an intervening Ninth Circuit case, *McCartey v. Massanari*, 298 F3d 1072 (9th Cir 2002). Tr 71-72. The Appeals Council further instructed the ALJ to "address the evidence . . . submitted with the request for review, take any further action needed to complete the administrative record and issue a new decision." Tr. 72.

---

[1] This avoids any *res judicata* effect the December 31, 1996 termination of benefits may otherwise have had on Kittelson's current application. Tr. 18-19.

The ALJ issued another Unfavorable Decision on April 21, 2005.  Tr. 13-28.  The

Appeals Council denied Kittelson's second Request for Review, making the ALJ's April 21,

2005 decision the final decision of the Commissioner which is subject to judicial review.  Tr. 7-

9, 12; 20 CFR §§ 404.981, 422.210.

## DISABILITY ANALYSIS

The initial burden of proof rests upon the claimant to establish disability.  *Roberts v.*

*Shalala*, 66 F3d 179, 182 (9th Cir 1995) (citation omitted), *cert denied,* 517 US 1122 (1996).  To

meet this burden, a claimant must demonstrate an "inability to engage in any substantial gainful

activity by reason of any medically determinable physical or mental impairment which can be

expected . . .to last for a continuous period of not less than 12 months."  42 USC § 423(d)(1)(A).

The claimant's mental or physical impairment or impairments must be "of such severity that he

is not only unable to do his previous work but cannot, considering his age, education, and work

experience, engage in any other kind of substantial gainful work which exists in the national

economy."  42 USC § 423(d)(2)(A).

The Commissioner has established a five-step sequential process for determining whether

a person is disabled with the meaning of the Social Security Act.  *Bowen v. Yuckert*, 482 US 137,

140 (1987); 20 CFR § 404.1520.  The claimant has the burden of proof on the first four steps.

*Tackett v. Apfel*, 180 F3d 1094, 1098 (9th Cir 1999).  First, the Commissioner determines whether

the claimant is engaged in substantial gainful activity.  20 CFR § 404.1520(b).  If not, then at

step two, the Commissioner must determine whether the claimant's impairment is "severe"

within the meaning of the Act.  20 CFR § 404.1520(c).   If the impairment is "severe," the

Commissioner must next determine at step three whether it is a "listed impairment."  20 CFR §

404.1520(d); 20 CFR Part 404, Subpart P, App. 1 ("Listing of Impairments"). If the impairment

equals a listed impairment, then the claimant is found disabled. *Id.*

If the impairment, even though "severe," does not equal a listed impairment, then the

analysis proceeds to an intermediary step to determine the claimant's residual functional capacity

("RFC"). 20 CFR §§ 404.1520(e), 404.1545. The RFC is an assessment of the sustained work-

related activities the claimant can still do on a regular and continuing basis, despite the

limitations imposed by his impairments. 20 CFR § 404.1545(a); SSR 96-8p. Based on the RFC,

the Commissioner then proceeds to step four to determine whether the claimant retains the

capacity to perform his or her past relevant work, defined as work the claimant has performed in

the past 15 years. 20 CFR §§ 404.1520(f), 404.1560(b)(1). If the claimant can perform past

relevant work, then he or she is not disabled.

Should the claimant be unable to perform his or her past relevant work, then the analysis

proceeds to step five, where the Commissioner bears the burden of proving that the claimant can

perform a significant number of other jobs in the national economy. 20 CFR § 404.1520(g);

*Tackett*, 180 F3d at 1099. If the Commissioner cannot meet this burden, then the claimant is

declared disabled. *Id.*

## THE ALJ's FINDINGS

At step one, the ALJ found that Kittelson had not engaged in substantial gainful activity

since the alleged onset date of his disability, January 1, 1997. Tr. 27. At steps two and three, he

found that Kittelson's combined psychological impairments were "severe," but did not meet or

medically equal one of the "listed" impairments. *Id.*

The ALJ found that during the period under review (January 1, 1997, to June 30, 1998) Kittelson retained the RFC to perform the exertional demands of work without limitation. *Id.* With respect to non-exertional limitations, the ALJ found that Kittelson "would have had difficulty performing detailed or complex job duties and instructions" and "was unable to tolerate more than occasional or sporadic public contact." *Id.* The ALJ also found that Kittelson's allegations of his limitations were "not totally credible." *Id.*

At step four the ALJ concluded that Kittelson's past relevant work as a dishwasher, deck hand, and security guard did not require the performance of work-related activities precluded by his RFC. *Id.* As a result, the ALJ found that Kittelson was not under a "disability" as defined in the Act during the period under review. Tr. 28.

## STANDARD OF REVIEW

The district court must affirm the decision if the Commissioner applied proper legal standards and the findings are supported by substantial evidence in the record. 42 USC 405(g); *Smolen v. Chater*, 80 F3d 1273, 1279 (9th Cir 1996). Substantial evidence is more than a scintilla but less than a preponderance, or "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Andrews v. Shalala*, 53 F3d 1035, 1039 (9th Cir 1995) (citation omitted).

This standard requires the district court to uphold the Commissioner's findings if supported by inferences reasonably drawn from the record. *Gallant v. Heckler*, 753 F2d 1450, 1452-53 (9th Cir 1984). The court must weigh all of the evidence, whether it supports or detracts from the Commissioner's decision, but if the evidence supports more than one rational interpretation, the court must defer to, and may not substitute its judgment for, that of the

Commissioner. *Martinez v. Heckler*, 807 F2d 771, 772 (9th Cir 1986); *Flaten v. Sec'y of Health & Human Servs.*, 44 F3d 1453, 1457 (9th Cir 1995).

## DISCUSSION

Kittelson does not challenge the ALJ's findings at the first three steps, but contests the ALJ's RFC determination and conclusion at step four that he can perform past relevant work. Kittelson argues that the ALJ erred by not assigning great weight to the VA Disability Rating, by rejecting his testimony as not credible, and by rejecting the opinion of his treating physician.

## I.      VA Rating Decision

One of the primary pieces of evidence offered by Kittelson was a VA Rating Decision granting him a pension for a "permanent and total" non-service connected disability as of June 2, 1998. Tr. 671. Under the heading "Reasons and Bases," the VA Rating Decision states that Kittelson "is unable to secure and follow a substantially gainful occupation due to disability." *Id*. The VA Rating Decision points out that he "has a history of depression and suicide attempts." *Id*. Considering Kittelson's "age, disabilities, education and occupational history," the VA Rating Decision adds that he "would have a difficult time securing and following a substantially gainful occupation." *Id*.

The failure of the ALJ to give the VA Rating Decision substantial treatment in his original opinion served as the basis for the Appeals Counsel's initial reversal and remand of the ALJ's decision. Tr. 71-72. In the Ninth Circuit, an ALJ "must ordinarily give great weight to a VA determination of disability." *McCartey*, 298 F3d at 1076. This is based on the extensive similarities in the purposes, processes and evaluation criteria employed by these two federal government programs. *Id.* However, an ALJ "may give less weight to a VA disability rating if

[the ALJ] gives persuasive, specific, valid reasons for doing so that are supported by the record." *Id.*

On remand, the ALJ gave several reasons to reject the VA Rating Decision. First, he stated that the medical records are "not indicative of a total disability." Tr. 24. Second, he pointed out that "[e]ven the VA Rating Decision does not indicate that the claimant is precluded from all work, it only notes 'he would have a difficult time securing and following a substantially gainful occupation'" which "does not preclude work." *Id.* Third, the ALJ concluded that "much of the VA record is concerned with [Kittelson's] history of alcohol abuse and treatment for it" which the Act excludes from the disability analysis. Tr. 24-25. He also chastized Kittelson for providing only the first page of the VA decision which fails to specifically reference any medical records or opinions considered in reaching the conclusion. Tr. 25.

The ALJ concluded by roundly criticizing *McCartey*. *Id.* He began by stating that "the fact the VA rating either includes, or simply ignores the claimant's alcoholism, highlights the *misperception* by the McCarty Court that disability evaluations under VA criteria and Social Security have a 'marked similarity.'" *Id* (emphasis added). He then listed the ways in which the VA decision submitted by Kittelson fails to meet the standards required by SSA for a finding of total disability: "there is no actual evaluation of the claimant's ability to perform full-time sustained work nor an analysis of the claimant's functional limitation;" unlike SSA evaluations which "involve an analysis and rationale by trained medical staff," the VA Rating Decision is "merely a conclusion by a claims adjuster at VA without a rationale;" and the VA decision "either incorporated or ignores the claimant's alcoholism." Tr. 25.

Although these reasons are specific, they are neither persuasive nor valid reasons to reject the VA Rating Decision. First, contrary to the ALJ's statement, the VA Rating Decision did, in fact, make a finding precluding all work. In addition to the one sentence quoted by the ALJ, it states in the preceding paragraph that Kittelson "is *unable* to secure and follow a substantially gainful occupation due to disability." Tr. 671 (emphasis added). That is a finding that all work by Kittelson is precluded.

Second, it is mere speculation by the ALJ that the VA Rating Decision was based in any measure on Kittelson's history of alcohol abuse. The VA record includes information relating to Kittelson's battles with alcoholism in 1995 and 1996. *See, e.g.*, Tr. 360 (May 17, 1996 discharge for his second DUI in less than a year), 395, 400. However, the VA Rating Decision makes no mention of any alcohol abuse, leaving the reader to guess as to the bases for the decision. The ALJ had the ability to clear up any ambiguity in the VA Rating Decision by procuring its missing pages in accordance with his duty to complete the administrative record. 20 CFR § 404.1512(e)(1). While a claimant bears the burden to produce evidence supporting his claim, the Ninth Circuit has recognized that the ALJ shares this burden and is under an "affirmative duty to assist the claimant in the development of the record." *Tackett*, 180 F3d at 1098, n3. Furthermore, in this case, the ALJ was under the affirmative command of the Appeals Council to "take any further action needed to complete the administrative record." Tr. 72. Whatever explication of the rational behind the one-page VA Rating Decision the ALJ needed, the ALJ should have procured it in compliance with his duty to complete the record.

Furthermore, contrary to the ALJ's finding, the VA Rating Decision is based on medical records indicating a total disability. It states that it was based on the "[o]utpatient treatment

reports from the VA Domiciliary White City from January 10, 1995 to July 10, 1998." Tr. 671.

The point is particularly significant as this covers the entire period Kittelson was in the VA Dom

during the period under review. In other words, the VA and ALJ looked at substantially the

same information reflecting the entire period under review, as well as several years of treatment

records pre-dating the date of alleged onset, and yet came to opposite conclusions. As explained

in more detail below, those records support a finding of disability due to depression. This court

will not permit the ALJ to speculate on the rationale behind the VA Rating Decision in order to

criticize binding Ninth Circuit precedent.

Accordingly, this court finds that the ALJ committed an error of law in failing to give the

VA Rating Decision great weight.

## II.     Testimony of Kittelson

The ALJ found that Kittelson's" allegations regarding his limitations were not totally

credible." Tr. 27. To reject Kittelson's complaints, the ALJ must provide "specific, cogent

reasons for the disbelief." *Lester v. Chater*, 81 F3d 821, 834 (9th Cir 1995), quoting *Rashad v.

Sullivan*, 903 F2d 1229, 1231 (9th Cir 1990). Indeed, unless affirmative evidence shows that the

claimant is malingering, the Commissioner must present "clear and convincing" reasons for

rejecting the claimant's testimony. *Id,* quoting *Swenson v. Sullivan*, 876 F2d 683, 687 (9th Cir

1989). The ALJ must go beyond mere findings by identifying the testimony that is not credible

and by citing to the evidence in the record that undermines the claimant's complaints. *Id*

(citations omitted).

Kittelson asserts that he "lack[s] the ability to concentrate; to focus on what I'm doing."

Tr. 129. His "brain shuts off so [he] can't perform," and he is overwhelmed by a crippling sense

of dread.  *Id*; Tr. 689.  The condition first bothered him in 1985, but became "acute" after he

worked on two different fishing boats that sank off the coast of Alaska.  Tr. 129, 140, 711.

Kittelson testified that he has problems coping due to "this awful dread" which causes his brain

to "shut down," rendering him unable to concentrate or focus on tasks.  Tr. 689.  He further

described his dread as a "very powerful" emotion:

> It's fear dealing with, its just always a feeling that it can, that there can
> only be one result and that's self-destruction. It has to be, I, I just feel that
> whatever I do, or don't do, or whatever, the inevitable result has to be
> suicide in some for whatever reason.

Tr. 691.

Kitelson's dread and depression cause him to miss meals, avoid other basic tasks, and

have led to self-medicating with alcohol.  Tr. 692.  He contends that his struggles with alcohol

abuse have always been a secondary symptom of his problems with depression and anxiety.  Tr.

129, 155, 692.

The ALJ rejected Kittelson's allegations and testimony as "disproportionate to the

objective findings in the medical record."  Tr. 25.  He pointed out that Kittelson had not sought

any medical attention for the first nine months of the period under review.  *Id.*  The ALJ further

noted that Kittelson's activities at the VA Dom ("assisting" and "group outings") "despite his

impairments, are more consistent with those of an individual able to sustain some work than they

are of an incapacitated person's [*sic*]."  *Id.*  The ALJ pointed to various notes in the record that

Kittelson's anxiety and depression were "stable with treatment" and that he "worked 20 hours a

week" at the VA Dom without any incidents or complaints and received compliments by the

staff.  Tr. 22.  Relying on these positive entries, the ALJ agues that the medical record does not

demonstrate total disability during the period under review, but rather shows that Kittelson's "symptoms and conditions were generally controlled by use of medications, without side-effects." Tr. 25.

The ALJ failed to acknowledge that Kittelson's many long-term residencies at the VA Dom do not indicate an ability to function independently in society, much less an ability to perform work. The record does support the conclusion that Kittelson achieved some level of functionality while at the VA Dom. Despite severe symptoms early on in his prior residencies at the VA Dom, for the most part Kittelson's depression seemed to be stable while residing there during the period under review. His condition remained much the same during the years following his date last insured, with a couple notable incidents where he suffered from increased anxiety and depression. Nevertheless, nothing in the record contradicts Kittelson's subjective description of his symptoms.

Kittelson reported seeing a psychiatrist for depression and anxiety in 1963 and suffering from depression since childhood. Tr. 231, 233. He attempted suicide in 1980 and again in 1988. Tr. 233. In November 1994 Kittelson sought admission to the VA Dom for treatment of his chemical and psychological issues. Tr. 231. Upon admission, Kittelson was diagnosed with alcohol dependence, major depression, potential PTSD, obsessive-compulsive personality disorder, and chronic anxiety. Tr. 232. He scored a 50 on the Global Assessment of Functioning (GAF) scale, which represents the presence of "[s]erious symptoms . . .OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *Id.* DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS ("DSM-IV"), 34 (4th ed 2000). He reported six admissions to VA facilities in five years and multiple prescriptions for

psychotropic drugs, all of which had "not been of value" to treating his depression.  Tr. 229.

Prior to his first admission to the White City VA Dom, Kittelson had already accumulated

multiple hospitalizations at VA treatment centers in Seattle and Virginia.  Tr. 232, 196-97.

During his 1994-95 admission to the VA Dom, Kittelson's depression initially worsened,

eventually resulting in an admission to the infirmary in June 1995.  Tr 215-21, 246-48.

Kittelson's condition in the infirmary was described as "characteristic of a major depression,

recurrent type," lasting "longer than a month with a loss of energy and vitality, psychomotor

retardation, weight loss, poor appetite and a feeling of hopelessness and passing thoughts of

suicide." Tr. 246.  When discharged two months later, Kittelson was stable and his major

depression appeared to be in full remission.  Tr. 247.  For about the next year, Kittelson's

depression appears to have stabilized, but he did suffer several periods of increased symptoms,

including two relapses into drinking alcohol.  Tr. 362-81.

Kittelson was discharged from the VA Dom on June 17, 1996, for breaking his alcohol

contract, receiving his second DUI and not following his treatment plan (he was not taking his

psychiatric medications and was "cheeking" his antabuse).  Tr. 360.  His discharge diagnoses

included alcohol dependence, abuse - acute and chronic; chronic depression, with major

episodes; history of multiple suicide attempts; and dual diagnosis, with antisocial manipulative

personality.  Tr. 400.

On October 19, 1997, Kittelson was again admitted to the White City VA Dom.  Tr. 358.

He reported being discharged two years previously with the hope of living independently in the

community, but became homeless, depressed and ultimately attempted suicide less than three

weeks prior to seeking readmittance by taking over-the-counter sleeping pills.  *Id*.  His diagnosis

at that time was "[d]epression by patient history." Despite initial feelings of depression (Tr. 346), within five months he "denie[d] any severe depression" and reported "really doing fairly well." Tr. 334. His treating physician, Dr. William B. Allen, noted that his depression was "currently stable." *Id.* Kittelson went on frequent outings, attended multiple support groups, and successfully carried out responsibilities assigned through Incentive Therapy ("IT") without complaints. Tr. 335-341, 525-26 (outings); 343, 345 (performance at job); 335-36, 341-48, 524-26 (participation in depression therapy group). His score on a modified Beck Depression Scale on December 5, 1997, indicated that he suffered only from "[m]oderate depression." Tr. 344. Overall, during the period under review, other than a couple of occasions in which he reported a depressed mood (Tr. 331, 334), the VA Dom treatment records do not record any major episodes of depressive symptoms. In fact, at his annual history and physical examination on September 18, 1998, Dr. Allen indicated Kittelson had a cheerful affect, normal eye contact and speech and his depression was "currently euthymic." Tr. 515.

Kittelson continued to do well in the VA Dom for the remainder of 1998 and the whole of 1999, receiving another positive annual review in September 1999. Tr. 457. Nothing remarkable appears in the record until April 21, 2000, when Kittelson met with his case manager and social worker, Stephen Auerbach, PhD, who noted:

> Despite this patient's success in functioning without an antidepressant [sic] for five months now, I still see this man as severely impaired by his depression and anxiety. While I think that a transition into the community is possible, and will continue to work with him on this as a goal, I do not think he is capable to [*sic*] supporting himself by working in a competitive work environment. Part time employment is possible, but I really see Jimmy as working as a care volunteer in a hospital as the most he will be able to do on a consistent basis. He continues to be at risk for suicidal

> ideation, and the stress of full time employment may well push him in that
> direction.

Tr. 437-38.

Prior to this comment, the last time suicidal ideation was noted in Kittelson's file was on January 4, 1999. Tr. 491.

On July 6, 2000, Dr. Allen reported Kittelson had been "really doing well [for the] last six months. No real acute problems." Tr. 577. Then in September 2000, Kittelson reported to VA psychiatrist, Dr. Andrew H. Mebane, that he had begun experiencing increased depression for the previous three months. Tr. 562-63. Dr. Mebane diagnosed Kittelson with "Major Depresssion, recurrent." Tr. 563. After a month of treatment, Dr. Mebane indicated the depression was "partially treated." Tr. 561. A week later Dr. Allen described his condition as "Major Depression, currently euthymic" and stated that Kittelson "had no severe depression now for some time." Tr. 558-60. Finally, in November 2000, Dr. Mebane listed his condition as "Major depression treated." Tr. 555.

In August 2000 Kittelson was evaluated by DDS psychologist Dr. Bill Hennings. Tr. 539-51. Dr. Hennings assessed the same functional limitations as had Dr. S. Michael Sasser, an examining psychiatrist, on June 18, 1998, and Dr. Henry, a reviewing physician, on July 8, 1998, both of whom the ALJ cited in arriving at his RFC. Tr. 26, 416-429.

Notes from the VA record for most of 2001 are unremarkable and include the usual entries for participation in depression support group and group outings, along with notes of his various medical checkups. In July 2001, Kittelson reported an increase in his anxiety and a "sense of doom"and reported some suicidal ideation, but no plan or intent. Tr. 602. On July 17,

2001, he met with VA psychiatrist, Dr. Gerardo A. Juan, who noted that Kittelson "did not appear to be grossly depressed" and again diagnosed him with "Major Depression Recurrent." Tr. 600. Dr. Juan assigned him a GAF of 65 which indicates "[s]ome mild symptom (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning." DSM-IV, 34.

In September 2001, Kittelson was screened for admission to a Day Treatment Program ("DTP") which began in October, replacing the depression support group. Tr. 593-94, 583. This was group of about 40 patients, each with severe psychological impairments, none of whom had a job outside of the VA Dom. Tr. 710. Much of the DTP was concerned with preparation and planning for independent living, including money management, mental health support, and a variety of various day-trips and outings. Tr. 585, 588, 652-54, 659, 662. During his DTP screening, Kittelson reported "trouble concentrating, setting goals, planning ahead, and making decisions." Tr. 594. He described himself as "often anxious, fearful and depressed" and "has trouble communicating, is uncomfortable around women, feels guilt and shame." *Id*. He said his "life is meaningless, his future looks hopeless and he feels powerless." *Id*. When asked about his past living situation, he reported that he while living on his own, "it was terrible. . . I hung out at taverns and attempted suicide." *Id.*

During the remainder of 2001 and the first half of 2002, Kittelson continued to go on social outings, attend DTP, and perform significant amounts of IT work assignments. Tr. 583-93, 651-65. He also began planning for a discharge from the VA Dom. Tr. 583, 625-35, 656-62, 669. On January 11, 2002, Dr. Ronald R. Stuart, a VA staff physician, performed a Record Review and opined that:

Mr. Kittelson's history of depression dates to age 9, and his depression was worsened by the addition of PTSD from his combat experience in Viet Nam. He has attempted to commit suicide several times. He has historically abused alcohol when depressed, but he has had only one relapse in the past several years, approximately two years ago. He takes Antabuse on a voluntary basis, and has demonstrated a sincere commitment to remaining sober. When depressed he is unable to cope with everyday problems that arise, and it is this inability to cope that makes him unemployable. He may be able to function well for an number of weeks, but when he becomes depressed he cannot tolerate being around other people. He has been evaluated by the VA as being incapable of competitive employment, and receives a VA NSC pension. He is currently appealing a denial of benefits by SSD, and I support his appeal based on his chronic psychiatric impairment.

Tr. 618.

Kittelson's depression took a turn for the worse in June 2002, apparently brought on by the stress and uncertainty involved in his planning for discharge from the VA Dom into the community. Tr. 651. On June 18, 2002, Kittelson reported to Dr. Juan that his symptoms had been worsening for the past six months and that he was having suicidal ideas although he did not believe he was a threat to himself. Tr. 666. Dr. Juan assessed a GAF of 40, signifying "[s]ome impairment in reality testing or communication (e.g. speech is at times illogical, obscure or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking or mood." DSM-IV, 34. Based on Dr. Juan's recommendation, Kittelson was hospitalized at the VAMC in Roseburg. Tr. 666, 649. During that hospitalization, the staff psychiatrist, Dr. Richard Turner, advised Dr. Auerbach, Kittelson's case worker, that Kittelson may not be a suitable candidate for independent living without close supervision and follow up care. Tr. 643.

Kittelson returned to the VA Dom on July 15, 2002.  Tr. 647.  He picked up pretty much where he left off by performing IT work, participating in day treatment classes and Tai Chi, and planning for life after the VA Dom.  Both Dr. Auerbach and Lafferty noted a less positive mood and affect then he had prior to his hospitalization. Tr. 638, 645.

In sum, Kittelson's depressive symptoms fluctuated throughout the six-and-a-half years he resided in the VA Dom.  Notably, during the portion of his residence that coincides with the period of review, the records indicate no periods of severe depression of the level reported by Kittelson to the ALJ.  However, despite this period of reduced symptoms, Kittelson was repeatedly diagnosed throughout his many years in the VA Dom as suffering from major depression.  Tr. 199 (July 1994); 231-32 (Nov. 1994); 403 (July 1995); 395 (Aug. 1995); 560 (Oct. 2000); 600 (July 2001); 629, (Jan. 2002); 666 (June 2002).  And, despite the stability achieved after his 1997 admission, treatment plans developed and reviewed by a team of VA staff (including physicians, a social worker, a psychiatrist, and a vocational expert, among others) continuously stated his barriers to discharge included the "need to be psychologically stable at level compatible with independent living, and the "need for structure to maintain highest level of function," and repeatedly assigned him an Addiction Severity Index ("ASI")[2]

_____

[2] The ASI is "a semi-structured clinical-research interview designed to measure patient status in seven functional domains: alcohol and drug use, medical and psychiatric health, employment/self support, family relations, and illegal activity."  A. Thomas McLellan, *et al*, *The Addiction Severity Index at 25: Origins, Contributions, Transitions,* http://www.tresearch.org/resources/pubs/ASIat25.pdf, 3 (2006) (also published in 15(2) American Journal of Addiction 113 (2006)).  Unlike the DSM-IV, it is not a screening or diagnostic tool, but is used primarily to assess intake status for individuals entering treatment.  *Id* at 27.  The ASI aids in the development of appropriate treatment plans that address the "addiction related" issues a person suffering from a drug or alcohol addiction may have.  *Id*; Samual H. Rikoon, *et al, Predicting DSM-IV Dependance Diagnosis from Addiction Severity Index Composite*, 31 Journal of Substance Abuse Treatment 17, 18 (2006).  It does not, however, answer the question of whether the addiction causes the problems in the other functional domains, or *vice versa*.  McLellan, *et al*, *supra* at 27.

rating of 9 ("severe") for both psychological and employment related issues. Tr. 337-38, 349, 450-51, 464-65, 496-97, 520-22, 566-67, 604-05, 639-40, 667-68.

Furthermore, both during and subsequent to the period under review, Kittelson's VA case worker determined that he was not yet ready for vocational rehabilitation due to his ongoing struggle with depression. For example, Dr. Auerbach notes on April 29, 1998, that Kittelson "is not yet ready for VRS [vocational rehabilitation] referral. We are working on what he wants to accomplish and what is possible given his hx [history] of depression and his age." Tr. 333. Again on August 25, 1998, two months past his date last insured, Dr. Auerbach again reported the Kittelson's "depression is stable with meds at present. *Not clear how much of this is due to living in structured environment*, where he has functioned well in the past. *Still too soon to explore VRS referral*." Tr. 519 (emphasis added). When he finally did begin vocational rehabilitation in March of 1999, Kittelson quit after the first day of training, explaining that he was feeling "a lot of turmoil inside, and anxiety." Tr. 476-77. Thus, during the period under review, the record reveals that Kittelson was suffering symptoms that his treatment team and case worker felt precluded him from independent living and substantial gainful activity.

Oddly, the ALJ stated that "VA staff . . . indicated that the claimant was a suitable vocational rehabilitation candidate. However, when given the opportunity, he did not pursue the vocational rehabilitation services offered to him." Tr. 22. As support, the ALJ cited to a period in the VA records after the date last insured (Tr. 577), but the cited entry does not discuss whether Kittelson is capable of gainful employment. Rather it only discusses the possibility of vocational rehabilitation. Moreover, during the relevant time period, the VA records do not even

support this minimal level of functional capacity (ability to engage in vocational rehabilitation),

stating several times that Kittelson was not ready for vocational rehabilitation. Tr. 333, 519.

A review of the administrative record supports the ALJ's finding that Kittelson

successfully performed IT work and participated in a multitude of outings. However, Kittelson

is not arguing that he never had a good day at the VA Dom. Rather, he contends that the ALJ

erred by relying on periods of stability at the VA Dom as evidence of his ability to perform his

past relevant work. The ALJ missed the fact that any success Kittelson achieved was only while

in the supportive, sheltered, non-stressful confines of the VA Dom. Entries in the VA record

indicating that Kittelson was doing well on a particular day, had a good time on a specific

outing, performed satisfactorily at his IT jobs, or that his depression had stabilized and was

under control, must be interpreted through the lens of the institutionalized setting free of the

ordinary pressures and responsibilities of ordinary independent living.

The Social Security Regulations recognize that claimants with chronic mental ailments

who live in structured and supportive settings may be much more impaired for work than their

symptoms and signs indicate. The impacts of these factors must be taken into account by the

Commissioner when determining whether a person is disabled:

> E. Chronic Mental Impairments: Particular problems are often involved in
> evaluating mental impairments in individuals who have long histories of
> repeated hospitalizations or prolonged outpatient care with supportive
> therapy and medication. Individuals with chronic psychotic disorders
> commonly have their lives structured in such a way as to minimize stress
> and reduce their signs and symptoms. Such individuals may be much
> more impaired for work than their signs and symptoms would indicate.
> The results of a single examination may not adequately describe these
> individuals' *sustained* ability to function. It is, therefore, vital to review
> all pertinent information relative to the individual's condition, *especially
> at times of increased stress*. It is mandatory to attempt to obtain adequate

descriptive information from all sources which have treated the individual either currently or in the time period relevant to the decision.

20 CFR Pt. 404, Subpt. P, App. 1, § 12.00(E) (1998) (emphasis added).

It is noteworthy that on three separate occasions, Kittelson's symptoms increased markedly when faced with the stress of responsibilities beyond his low-stress life at the Va Dom. Tr. 651, 666 (preparation for discharge back into community); Tr. 334 (completion of SSD application); Tr. 476-77 (attempted entry into vocational rehabilitation employment). In evaluating whether the claimant satisfies the disability criteria, the Commissioner must evaluate the claimant's "ability to work on a *sustained* basis." *Lester*, 81 F3d at 833 (emphasis added); 20 CFR § 404.1512(a). Occasional symptom-free periods, and even the sporadic ability to work, are not inconsistent with disability. *Id* (citations omitted).

The regulations make it clear that the Commissioner must consider Kittelson's ability to function outside the protective environment of the VA Dom:

> F. Effects of Structured Settings: Particularly in cases involving chronic mental disorders, overt symptomatology may be controlled or attenuated by psychosocial factors such as placement in a hospital, board and care facility, or other environment that provides similar structure. Highly structured and supportive settings may greatly reduce the mental demands placed on an individual. With lowered mental demands, overt signs and symptoms of the underlying mental disorder may be minimized. *At the same time, however, the individual's ability to function outside of such a structured and/or supportive setting may not have changed.* An evaluation of individuals whose symptomatology is controlled or attenuated by psychosocial factors must consider the ability of the individual to function outside of such highly structured settings.

20 CFR Pt. 404, Subpt. P, App. 1, § 12.00(F) (1998) (emphasis added).

In view of these regulations, the ALJ's reliance upon various positive notes in the VA file is unavailing. There is no evidence in the record that Kittelson was able to achieve the same

levels of functionality while living independently as during his stay at the VA Dom. In fact, in a period of nearly eight years, Kittelson spent only one 18-month period outside the structured environment of the VA Dom. This period ultimately culminated in Kittelson attempting suicide and subsequently seeking readmission to the VA Dom.[3]

Given the absence of affirmative evidence of malingering, the ALJ must provide "clear and convincing" reasons for rejecting Kittelson's subjective testimony regarding his symptoms. *Lester*, 81 F3d at 834. The ALJ has not done this. According to the record, Kittelson is an individual suffering from depression who maintains, at best, a moderate level of functional capacity only while in an institutionalized setting without the same pressures and responsibilities of independent living. The ALJ infers from the small successes Kittelson achieved while in the VA Dom that Kittelson's subjective testimony regarding his depression is less than credible. Such an inference does not constitute a clear and convincing reason to reject Kittelson's testimony when the only period Kittelson spent outside of the VA Dom resulted in his relapsing into depression and alcoholism and attempting suicide. This hardly demonstrates a sustained ability to function outside the Va Dom. As a result, the ALJ erred in finding Kittelson less than credible.

**III.**     **Opinion of Treating Physician**

Kittelson also contends that the ALJ improperly rejected the opinion of his treating physician, Dr. Stuart, M.D. As noted above, Dr. Stuart conducted a Record Review and issued a summary of Kittelson's history and condition on January 11, 2002, more than three-and-a-half

---

[3] The ALJ refers to Kittelson's suicide attempts as "gestures" and doubts the veracity of Kittelson's reports. Tr. 20, 24. Given Kittelson's extensive medical history of depression and consistent reports of suicide ideation, little evidence casts doubt on his veracity. Nor does a review of the record reveal any inconsistencies in Kittelson's reports of attempted suicide.

years after the expiration of Kittelson's disability insured status.  Tr. 618.  Dr. Stuart again

diagnosed Kittelson with major depression.  *Id.*  He noted that Kittelson had suffered from

depression since age nine which was worsened by his combat experience in Viet Nam.  *Id.*  He

also opined that Kittelson was unemployable due to "his chronic psychiatric impairment."  *Id*.

The ALJ did not afford significant weight to Dr. Stuart's opinion for several reasons.

Tr. 23.  First, he noted that Dr. Stuart "does not appear to be a mental health professional" and

that the VA Dom records "do not indicate that he has been significantly involved in [Kittelson's]

mental health treatment."  *Id*.  The ALJ also concluded that Dr. Stuart's conclusions were not

supported by evidence in the record.  For example, Dr. Stuart said that PTSD was a

compounding factor in Kittelson's depression whereas the ALJ found that Kittelson "repeatedly

denied the presence of pervasive PTSD symptoms."  *Id*.  Dr. Stuart also said that Kittelson

suffered periods of increased depression which made him unable to cope, whereas the ALJ found

no support in the record to "indicate a pattern of waxing and waning symptoms."  *Id*.  The ALJ

further criticized Dr. Stuart's evaluation of Kittelson's employability because he "has not

established credentials as a vocational expert.  Accordingly, he is not qualified to determine Mr.

Kittelson's 'employability.'"  *Id*.  He also pointed out that Dr. Stuart's finding "does not indicate

any specific functional limitations recognized by our Agency as a means of assessing an

individual's disability."  *Id.*  To the ALJ, it was "clear that Dr. Stuart ha[d] not reviewed the

large VA medical file or ignored it, in regards to the period under current review."  *Id*.

The opinion of a treating physician "as to the nature and severity of an individual's

impairment must be given controlling weight if that opinion is well-supported and not

inconsistent with the other substantial evidence in the case record."  *Edlund v. Massanari*, 253

F3d 1152, 1157 (9th Cir 2001). The ALJ may discredit the opinion of a treating physician that is "conclusory, brief, and unsupported by the record as a whole, or by objective medical findings." *Batson v. Comm'r*, 359 F3d 1190, 1195 (9th Cir 2004) (internal citations omitted). Also "[t]he Commissioner is required to give weight not only to the treating physician's clinical findings and interpretation of test results, but also to his subjective judgments." *Lester,* 81 F3d at 832-33 (citation omitted).

"As a general rule, more weight should be given to the opinion of a treating source than to the opinion of doctors who do not treat the claimant." *Id* at 830 (citation omitted). A treating physician's opinion may be rejected only for "clear and convincing" reasons when it is not contradicted by another doctor. *Id* (citation omitted). "Even if the treating doctor's opinion is contradicted by another doctor, the Commissioner may not reject this opinion without providing 'specific and legitimate reasons' supported by substantial evidence in the record for so doing." *Id,* quoting *Murray v. Heckler*, 722 F2d 499, 502 (9th Cir 1983).

While Dr. Stuart's opinion was given several years after Kittelson's date last insured, "medical evaluations made after the expiration of a claimant's insured status are relevant to an evaluation of the preexisting condition." *Lester,* 81 F3d at 832, quoting *Smith v. Bowen,* 849 F2d 1222, 1225 (9th Cir 1988).

The record does provide some support for the ALJ's statement that Dr. Stuart was not significantly involved in Kittelson's mental health treatment. At the VA Dom, Dr. Allen was Kittelson's primary treating doctor throughout the period under review and for several subsequent years. Although it is not clear from the record, it appears that Dr. Stuart briefly took over this role sometime in July 2001 or early 2002. Tr. 603, 618, 625. Kittelson was not,

however, unknown to Dr. Stuart. Dr. Stuart met Kittelson on one occasion in Dr. Allen's absence in 1998 to evaluate an eye problem. Tr. 331. Dr. Stuart later participated on Kittelson's 2002 treatment team review along with several other long-term members on Kittelson's treatment team. Tr. 625. After this meeting Dr. Stuart conducted his Record Review, diagnosed Kittelson with major depression, and rendered his opinion. Tr. 618. His comments were apparently reviewed by Dr. Auerbach, Kittelson's case worker since 1997, who corrected only a minor point in his entry immediately following Dr. Stuart's Record Review. Tr. 618. The record shows another contact by Dr. Stuart with Kittelson in July 2002 to discuss his medications. Tr. 603.

Despite his limited contact with Kittelson, Dr. Stuart nonetheless qualifies as a treating physician. Dr. Stuart was responsible for Kittelson's continuing care, had met Kittelson (an unknown number of times), and had the advantage of direct contact with the numerous members of Kittelson's treatment team. As explained by the Ninth Circuit:

> [T]he treating physician's continuing relationship with the claimant makes him especially qualified to evaluate reports from examining doctors, to integrate the medical information they provide, and to form an overall conclusion as to functional capacities and limitations, as well as to prescribe or approve the overall course of treatment.

*Lester*, 81 F3d at 833.

In view of Dr. Stuart's level of involvement in Kittelson's care, the ALJ erred in rejecting Dr. Stuart's evaluation on the basis of his lack of significant contacts with him. *See Benton v. Barnhart*, 331 F3d 1030 (9th Cir 2003) (ALJ erred in not crediting testimony of psychiatrist as claimant's "treating physician" where psychiatrist diagnosed claimant after one meeting but continued to serve as head of her treatment team at her HMO).

Similarly, the ALJ erred in assigning little weight to Dr. Stuart's opinion on Kittelson's employability due to the fact that Dr. Stuart was not a vocational expert. Although Dr. Stuart is not a vocational expert, he was a member of the treatment team who oversaw Kittelson's treatment. This team included a vocational rehabilitation specialist. Tr. 625. As a member of the treatment team, Dr. Stuart's Record Review was as a collective assessment of the overall condition of Kittelson represented by his many years of treatment while residing as the VA Dom. According to Kittelson, Dr. Stuart wrote the Record Review as the lead member of his treatment team and at the behest of all the members. Tr. 709. As such, his opinion reflects the combined opinion of Kittelson's physician, social worker, vocational rehabilitation specialist, psychiatrist, and other members of Kittelson's treatment team. Tr. 625.

Finally, the ALJ found that the record did not show a record of waxing and waning depression during the period under review that would support Dr. Stuart's opinion that Kittelson was unemployable. The ALJ again misses the point. The very fact that Kittelson was an inpatient at the VA Dom and repeatedly assessed by his treatment team as not yet prepared for independent living demonstrates that he was "unable to cope with everyday problems" as stated by Dr. Stuart. Tr. 618. Furthermore, as discussed above, Kittelson had several periods of increased symptoms over the course of his extensive residency at the VA Dom. Finally, while the record does not show these patterns occurring every few weeks as stated by Dr. Stuart, that minor error alone does not provide a specific and legitimate reason for rejecting Dr. Stuart's opinion.

The ALJ also objected to Dr. Stuart's "diagnosis" of PTSD. Tr. 22-23, However, Dr. Stuart's comments do not amount to a "diagnosis" and, in any event, Kittelson does not

claim he is disabled due to PTSD. Nevertheless, the record contains an overwhelming amount of evidence to support the point made by Dr. Stuart that Kittelson's nearly life-long struggle with depression was compounded by symptoms of PTSD experienced both after Kittelson's experience in Viet Nam and after his being on two fishing boats that sank off the coast of Alaska. Tr. 197, 223, 230, 232-33, 252, 346, 351, 353, 356, 417, 461, 463, 467, 469, 471, 473-75, 478, 480, 482-84, 488. The fact that he may not have been experiencing pronounced PTSD symptoms during the period under review does not negate the possibility that PTSD has played a role in the duration and severity of his depression.

Because each of the ALJ's bases for rejecting Dr. Stuart's opinion fails, the ALJ erred in giving the opinions of Dr. Sasser and Dr. White more weight. Dr. Sasser was an examining physician, not a treating physician, and examined Kittelson after he had been in the supportive confines of the VA Dom for six months without accounting for the impact Kittelson's environment had on his present mood. That may be why Dr. Sasser diagnosed Kittelson with dysthymia, as opposed to major depression, in conflict with the great weight of the record. Tr. 419; *compare* DSM-IV, 374 (discussing dysthemia as a less debilitating form of depression than major depression), *with Id* at 369-73. Dr. White was neither a treating nor an examining physician and also failed to account for any impact of a structured environment on Kittelson's functional limitations. As the treating physician, the opinion of Dr. Stuart should have been given controlling weight because it is well supported and not contradicted by substantial evidence in the record.

///

///

**IV.** **Remand**

After finding that the ALJ erred, this court has discretion to remand for further proceedings or for immediate payment of benefits. *Harman v. Apfel*, 211 F3d 1172, 1178 (9th Cir 2000). The issue turns on the utility of further proceedings. A remand for an award of benefits is appropriate when no useful purpose would be served by further administrative proceedings or when the record has been fully developed and the evidence is not sufficient to support the Commissioner's decision. *Rodriguez v. Bowen*, 876 F2d 759, 763 (9th Cir 1989). Thus, improperly rejected evidence should be credited as true and an immediate award of benefits directed where "(1) the ALJ has failed to provide legally sufficient reasons for rejecting such evidence, (2) there are no outstanding issues that must be resolved before a determination of disability can be made, and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited." *Harman*, 211 F3d at 1178, citing *Smolen*, 80 F3d at 1292. Where it is not clear the ALJ would be required to award benefits were the improperly rejected evidence credited, the court has discretion whether to credit the evidence. *Connett v. Barnhart,* 340 F3d 871, 876 (9th Cir 2003).

Here the ALJ improperly rejected the VA Rating Decision, the testimony of Kittelson, and the opinion of Dr. Stuart. After rejecting these pieces of information, the ALJ relied upon the opinions of Dr. Sasser, an examining psychiatrist, and Dr. Henry, a reviewing source, to establish Kittelson's RFC. Tr. 21, 26, 416-420, 431-434, 696-700. At the hearing, using this RFC, the ALJ posed a series of hypotheticals to the VE. Tr. 697-700. Based on the VE's testimony that this RFC did not preclude Kittelson from performing past relevant work as a

dishwasher, deck hand, and security guard as of June 30, 1998, the date last insured, the ALJ found Kittelson not disabled. Tr. 26.

At the hearing, Kittelson's counsel also posed a series of hypotheticals to the VE, ostensibly based upon the RFC supported by Kittelson's testimony and the other evidence the ALJ rejected. The VE concluded that a person with the RFC described by Kittelson's counsel, would not be able to procure "ongoing employment." Tr. 703-04. Thus, if credited, this evidence clearly establishes that Kitttelson is incapable of performing substantial gainful employment.

Because no outstanding issues must be resolved before a determination of disability can be made, and it is clear from the record that the ALJ would be required to find Kittleson disabled if all improperly rejected evidence were credited, this case should be remanded for a determination and award of benefits. *Smolen*, 80 F3d at 1292.

## ORDER

For the reasons state above, the decision of the Commissioner is REVERSED and the case is REMANDED to the Commissioner for the calculation and payment of benefits pursuant to Sentence Four of 42 USC § 405(g).

DATED this 30th day of October, 2007

/s/ Janice M. Stewart_____
Janice M. Stewart
United States Magistrate Judge